Filed 9/23/20  P. v. Ortega CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PHILLIP RAUL ORTEGA,<br><br>    Defendant and Appellant. | H045850<br>(Santa Clara County<br>Super. Ct. No. C1763353) |

Defendant Phillip Raul Ortega was convicted by a jury of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1))[1], and the jury found true allegations that he had personally used a deadly or dangerous weapon (§ 12022, subd. (b)(1)) and personally inflicted great bodily injury (§ 12022.7, subd. (a)) in the commission of the assault.  The court found true allegations that defendant had suffered two prior strikes (§§ 667, subds. (b)-(i), 1170.12) and one prior serious felony conviction (§ 667, subd. (a)).[2]  Defendant was committed to state prison to serve an indeterminate term of 25 years to life consecutive to an eight-year determinate term.

On appeal, defendant contends that (1) the trial court prejudicially erred in precluding the defense from asking a prosecution witness (who testified that he had overheard an argument between defendant and the victim at the time of the assault)

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

[2] The strike and prior serious felony conviction allegations were bifurcated, and defendant waived his right to a jury trial on them.

whether he had heard rumors about the assault before he spoke to the police and before he discussed the assault with the victim months later and whether he had told the victim about these rumors, (2) the trial court prejudicially erred in admitting as a prior consistent statement and under Evidence Code section 356 evidence that the victim had told that prosecution witness, during their discussion of the assault, that defendant had hit him with a bat, (3) his trial counsel was prejudicially deficient in failing to make adequate objections to these two alleged errors, (4) the alleged errors were cumulatively prejudicial, and (5) a remand is required for the trial court to exercise its discretion to strike the prior serious felony finding. We agree that a remand is required for the court to exercise its discretion to strike the serious felony enhancement, but we reject the remainder of defendant's contentions.

## I.      THE PROSECUTION'S CASE

In April 2017, Ricardo Lopez had been living at a homeless encampment in San Jose for about two years. Defendant also lived in the encampment, and the two men were friends. Defendant had left a box of tattoo equipment in Lopez's tent. The contents of the box disappeared shortly after a man named "Creeper" stayed in Lopez's tent for a few days. Lopez suspected that Creeper had taken the tattoo equipment. Lopez told defendant that he "had nothing to do with" the disappearance of the tattoo equipment.

George Ramirez was a friend of Lopez and lived in a tent near Lopez's tent. Defendant lent Lopez an inverter, which Lopez and George "burned out."[3] Lopez gave the inverter back to defendant, telling him that it "didn't work" and that he or George might have crossed the wires.

---

[3] We refer to George by his first name because his brother, Paul Ramirez, also lived in the encampment.

2

On April 30, 2017, Lopez returned to his tent after a trip to a store and saw a "silhouette" in a mirror that he thought was someone trying to hide behind a tree. Lopez thought this person might be Creeper, and he went to see defendant and asked him to come with him back to his tent because Creeper and "Costa" were "in the bushes." Defendant, who had a woman with him in his tent, said he was busy and Lopez should come back later. Lopez returned to his tent and called out to whoever it was to leave.

Defendant arrived about 10 to 20 minutes later with Marilyn Corr and asked where the person was. Lopez directed them to where he had seen the silhouette, but no one was there. Lopez went into his tent to get his jacket so that he and defendant could go searching for Creeper. When he came back out of his tent, defendant said "go ahead." As Lopez walked away from his tent, he was hit in the back of the head. He turned around and saw defendant holding a bat. Lopez asked defendant why he was doing this, and defendant accused Lopez of stealing from him. Defendant proceeded to hit Lopez multiple times with the bat. Eventually Lopez got up, defendant told him to leave, and Lopez left the encampment.

Lopez went to a liquor store and was taken from there by ambulance to the hospital. Before he was taken to the hospital, Lopez told a police officer that he did not know who had hit him, but it was two or three Mexicans. Lopez could not remember anything after being at the liquor store until he was in the hospital "[w]aking up out of a coma" many weeks later. Lopez had numerous facial fractures, a broken hand and arm, a broken knee, a bruised lung, and a broken rib from the assault, and he was in the hospital for several weeks.

Approximately two weeks after the assault, the police went to the encampment and spoke with Corr, who had been living there for about six months. Corr knew Lopez, but she hated him because Lopez had stolen from her in the past. Corr and defendant had been "seeing each other on and off," and she was staying in defendant's

3

tent at the time of the assault. Corr, defendant, Lopez, George, and George's brother, Paul, all used methamphetamine and had used it together on numerous occasions.

Corr told the police that defendant had assaulted Lopez, and she described the assault. When Lopez came to defendant's tent that night, Corr, who was there and had been using methamphetamine with defendant, thought Lopez was "just messing with us." Corr and defendant went to Lopez's tent, with Corr carrying a baseball bat and defendant carrying a steel bar. They switched weapons after they arrived at Lopez's tent. Lopez was outside his tent "singing and drinking." He directed them to the bushes, but they saw no one in the bushes.

While Corr was looking in the bushes, she heard defendant yell at Lopez, and she then saw that defendant was beating Lopez with the bat. After defendant had hit Lopez "countless times," defendant told Lopez to "leave and not come back." Lopez limped away, and Corr went into his tent and took as many of his things as she could. She told the police that she was angry at defendant, who she called her "enemy," because he had "attacked" her three times. Corr pointed out to the police a bat in defendant's tent.

Lopez was not discharged from the hospital until May 23, 2017, when he was transferred to a rehabilitation center. Eventually, he left the rehabilitation center in a wheelchair and returned to the encampment seeking "closure," but defendant was no longer there. Lopez did not talk to George or Paul or anyone else at the encampment that day. That same day, Lopez then went to stay with his sister and niece. He was "kind of delusional" at that point and told his sister a story about having been attacked by gang members, which was something that had happened to him before and which he thought would be easier for his sister to hear. Lopez admitted that he had a drug problem and that people in the encampment ordinarily did not talk to the police because it was "against . . . the rule of the street." After staying with his sister and niece for a while, Lopez returned to living at the homeless encampment.

4

George testified at trial that he was living in a tent either 20 or 41 feet from Lopez's tent on April 30, 2017. George heard an argument between Lopez and defendant at around the time of the assault. Sometime after Lopez got out of the hospital, George spoke to Lopez about the assault and he told Lopez about what he thought had happened that night. George told Lopez that he had heard him and defendant arguing that night. George testified that he never spoke to Corr about what had happened that night. George did speak to Paul about what had happened, and Paul told George what he thought had happened. George testified on redirect that, during a conversation with Lopez after Lopez got out of the hospital, Lopez told George that defendant had hit him with a bat.

On July 18, 2017, after Lopez apparently had moved back to the encampment, he was interviewed by the prosecutor's investigator. The investigator asked Lopez "[w]hat happened," and he described essentially what he testified to at trial. This was the first time that Lopez had told law enforcement that defendant was his assailant.

## II.    DEFENSE CASE

Lopez's niece testified that Lopez came to visit her on June 28, 2017. He was "on medication" and "groggy." Lopez told her that he had been staying at an encampment and "a group of guys came and brutally beat him" with a bat. Lopez described his assailants as "scraps" (gang members) who wanted his campsite, and he said that his girlfriend was present during the beating and did not help him. On a subsequent day, Lopez told his niece that the police " 'already got the guys, and they're already in jail.' " Lopez stayed at his niece's house for about three weeks. They discussed the attack multiple times, and Lopez's story never changed. After that, he left, and she did not see him again.

A defense expert testified that methamphetamine users are often paranoid. "They will actually start hallucinating, as in they're seeing shadows or dark figures in the bushes or in the trees or, you know, following them . . . ." Chronic longtime

methamphetamine users may suffer from cognitive and memory impairments. "[T]he details of the memories that they're recalling aren't always the way that they—they actually happened."

Defendant testified that he had known Lopez for three years and considered him "[a] very good friend of mine." Defendant had lent Lopez a jacket and a bike. The bike was returned but not the jacket. Around April 15, 2017, defendant gave his tattoo equipment, which was in a briefcase, to Lopez for "safekeeping." A week later, defendant went to Lopez's tent to see Lopez and found Creeper, but not Lopez, in Lopez's tent. Defendant did not "get a good vibe" from Creeper and avoided him. Later, defendant and a friend were in Lopez's tent in Lopez's absence, and defendant opened up the briefcase and found it empty. Defendant "was pretty upset," but he "didn't confront" Lopez about it.

A couple of days later, sometime around the end of April 2017, Lopez came to defendant's tent, "explained what had happened," and returned defendant's empty "tattoo box." Lopez told defendant that he believed that Creeper had taken defendant's tattoo equipment, and defendant told Lopez to try to get it back. After that, Lopez borrowed an inverter from defendant. Defendant later asked his friend Costa to get the inverter back from Lopez. When Costa brought the inverter back, it no longer worked. Defendant asked Lopez about it, and Lopez admitted that he or someone else had used it incorrectly. Defendant testified that he was not upset at Lopez about the inverter, and he was able to fix the inverter.

One night, Lopez came to defendant's tent and told him that he and a friend had Creeper trapped in the bushes. Lopez wanted defendant to come with him back to his tent. Defendant did not believe Lopez and had a woman named Amber with him so he was not willing to leave his tent. Although defendant admitted that he and Corr were "seeing each other on and off," defendant testified that he and Amber, who he had just

6

met that day, were "intimate, in bed" when Lopez came by. Defendant told Lopez "[y]ou said you were going to handle it." Lopez said "[a]ll right" and left.

Defendant testified that he spent the night with Amber and did not leave his tent that night or the next morning, and that he did not see Corr that day at all. He insisted that he had never assaulted Lopez. The next day, defendant heard from another encampment resident that George and Paul were saying that Lopez "had got beat up" and was in the hospital. He also heard from one of Lopez's friends that Lopez was in the hospital. Two days later, defendant and Corr went to Lopez's tent and took some of his belongings to defendant's tent "for safekeeping." Defendant testified that this was how he acquired the baseball bat, which he claimed had been something Lopez carried around.

Defendant testified that Corr had a history of stealing things. He had told the people she had stolen from that she had their belongings. Corr did not like Costa, who often stayed in defendant's tent. Defendant denied that he had ever hit Corr.

## III. DISCUSSION

### A. *Evidentiary Issues*

#### 1. *Background*

On April 30, 2017, Lopez told the police that he did not know who had attacked him. He said he had been attacked by two or three Mexicans. On June 28, Lopez told his niece that a group of Mexican gang members had beaten him. He stuck to this story during the time he stayed with his niece before returning to the encampment. On July 18, Lopez told the prosecutor's investigator that defendant was his assailant. At the August 1 preliminary examination, Lopez testified that defendant was his assailant.

Paul testified at the preliminary examination that on April 30, 2017 he heard sounds "like someone was getting hit," and then heard defendant yelling something at Lopez. Paul also testified that by the day after the incident, "the word was out already

7

that it happened." Someone other than Lopez told Paul that defendant had attacked Lopez. Paul did not testify at trial.

George testified at the preliminary examination that around 3:00 a.m. on April 30, 2017 George heard Lopez and defendant arguing outside his tent. George testified that he spoke to the police a week later. Before he spoke to the police, George had heard from the man whose tent was between Lopez's tent and George's tent and possibly others "[a] little bit" about what had happened. People in the encampment were saying that Lopez had been hit with a bat. George initially testified that these people did not identify Lopez's assailant. On cross-examination, George was asked: "Did you speak with Mr. Lopez at all about what had happened that night?" He responded: "Yeah. After he got out of the hospital." Then, this colloquy occurred: "Q [defendant's trial counsel]: Did you talk to him about what you thought had happened? [¶] A. Yes. [¶] Q. And you told him what you had heard? [¶] A. Yes. [¶] Q. And you told him that you had heard that [defendant] had done that? [¶] A. Yes." On redirect, George testified that Lopez told George that defendant had hit him with a bat. In addition, on redirect, the prosecutor asked: "But were people in the encampment saying that defendant hit [Lopez] with the bat, or were they just saying [Lopez] got hit with the bat? [¶] A. Yes. [¶] Q. Which one? [¶] A. Rick got hit with the bat."

Defendant's trial counsel, in her opening statement, told the jury that, before anyone had identified to the police defendant as Lopez's assailant, "there's a story circulating" in the homeless encampment that defendant had attacked Lopez.

Immediately after George testified at trial that Lopez had told him that defendant had hit Lopez with a bat, the jury left for its evening break, and the court made the following statement on the record: "Let me just indicate the last piece of testimony of Mr. Ramirez regarding Mr. Lopez's statement that Mr. Ortega hit him with a bat, that statement made to Mr. Ramirez appears to me to be a prior consistent

8

statement under Evidence Code 791. [¶] We have a statement in court of defendant hit him with a bat, an inconsistent statement previously about the alleged gang members, and then this appears to be a prior consistent statement to that and therefore is admissible under 791."

Defendant's trial counsel challenged the court's assertion: "We have no idea when that was in conjunction with—I don't believe it was necessarily before—we don't have a timeline, do we? A reliable timeline." The court defended its reasoning: "I believe it is a—there is a timeline to infer that the statement by Mr. Lopez to Mr. Ramirez *predated* Mr. Ramirez's inconsistent statement to his family members. [¶] I also believe that the statement is admissible under 356 as a—gives context and completion to the partially admitted statement." (Italics added.)

Defendant's trial counsel made a record outside the presence of the jury regarding questions about "rumors" that the trial court had precluded her from asking George. "I was requesting to go into the rumors that had been—that Mr. Ramirez testified to when he said people were talking at the encampment before Mr. Lopez returned. And I had requested to be allowed to go into that, and that was not granted." The court responded: "Yes. I—I think it would be hearsay and irrelevant absent some connection with that alleged rumor to the percipient witnesses who have testified, such as Ms. Corr. He indicated, 'he' being Mr. Ramirez, that he had not spoken to Ms. Corr about it. So that's why I disallowed that testimony." Defendant's trial counsel argued: "But, your Honor, my theory was that . . . was part of an entire rumor mill that was going on and around and that eventually it did get to Mr. Lopez."

The court rejected this argument. "[T]he problem with the theory, at least from my viewpoint, is it's one thing to connect it to Mr. Lopez and Ms. Corr, who are percipient and have testified to what they heard. [¶] A statement that Mr. Ramirez heard or didn't hear, without connecting it, there's no way to know that Mr. Lopez heard that and adopted it. So I think it's irrelevant absent a foundation that somehow

9

Mr. Lopez heard something from Mr. Ramirez or Mr. Lopez heard the rumor from some other source. [¶] So that's why I sustained the objection."

Defendant's trial counsel continued to pursue the issue. She pointed out that Lopez had made two inconsistent statements (to the police that he did not know who attacked him, and to his family that gang members had attacked him) and that his "much later" statement that defendant had assaulted him "had to come from somewhere . . . ." However, the court continued to insist that the foundation required was a witness who could testify that he or she *had told Lopez* about a rumor. The court did not find that George had provided that foundation. "I just will state for the record that Mr. Ramirez was very nonresponsive to many of the questions, had extremely lengthy pauses, and, charitably saying, . . . it was difficult for him to process the questions and—and the answers." "[T]here really has to be a connection, a bridge, to attach any such rumors to Mr. Lopez, and I—and I haven't heard that."

At the instruction conference, in connection with a proposed instruction that Lopez's statement to the prosecutor's investigator was admitted not for its truth, the court further explained its view: "[W]e have a statement at preliminary hearing and a statement at trial that are [defendant] is the person who assaulted him. [¶] We have a previous statement made to [Lopez's niece] that it was a group of people involved, with no delineation as to the defendant or not, not particularly identifying any person, but a group of people. That's inconsistent. That's been brought out as a prior inconsistent statement. [¶] So Mr. Lopez's statement changed at some point . . . . [¶] The timing of that is important . . . So the timing of where he may have received that information is important. [¶] Because if—if the idea is that there's a rumor mill out there and that rumor mill tells Mr. Lopez and other people at the homeless encampment that [defendant] did it and . . . Mr. Lopez adopts that, the timing of that is important, because we have to know how much exposure he had to that alleged rumor mill. [¶] And we know that as of the date that he's interviewed by the DA

10

investigator that that has already occurred. He's already identified [defendant]. So that gives us a window of when that may or may not have influenced his opinion." The court instructed the jury that Lopez's statement to the investigator was not to be used for its truth.

The prosecutor argued that defendant had returned to the encampment directly from the rehabilitation center and then had gone to his sister's home. She asserted that the story defendant had told his family was inconsistent only because Lopez purposely misled his family to "make the situation seem less bad" so that they would not "worry."

Defendant's trial counsel's closing argument did not mention Lopez going to the encampment after he left the rehabilitation center. Defendant's trial counsel argued that Corr had "fabricated the story about—about [defendant] assaulting [Lopez]" and "spread it within the encampment" in order to give defendant "a bad reputation." She asserted that George "could easily have been influenced by [Corr] talking about [defendant] being the culprit," and that the fact that Lopez had made inconsistent statements showed that he was "easily influenced to believe many different things."

### 2. *Exclusion of Evidence of Rumors*

Defendant argues that the trial court prejudicially erred when it refused to allow the defense to cross-examine George about rumors concerning the assault that were circulating in the encampment before he spoke to either the police or Lopez about the assault.

The trial court excluded this evidence on the grounds that it was "hearsay and irrelevant absent some connection" between the rumors and Lopez. "I think it's irrelevant absent a foundation that somehow Mr. Lopez heard something from Mr. [George] Ramirez or Mr. Lopez heard the rumor from some other source."

11

"[T]here really has to be a connection, a bridge, to attach any such rumors to Mr. Lopez, and I—and I haven't heard that."

The Attorney General does not defend the trial court's conclusion that the excluded evidence was hearsay. Plainly, it was not. " 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is *offered to prove the truth of the matter stated*." (Evid. Code, § 1200, subd. (a), italics added.) The defense did not seek testimony about the rumors "to prove the truth of the matter stated"—that is, that the rumors were true. Instead, it sought to elicit George's testimony about the rumors to establish that Lopez had been influenced by *false* rumors misidentifying defendant as Lopez's assailant.

The trial court's reliance on a purported lack of relevance was also erroneous. "Except as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

"Broadly speaking, an appellate court reviews any ruling by a trial court as to the admissibility of evidence for abuse of discretion. [Citation.] Specifically, it scrutinizes a decision on a motion to bar the introduction of evidence as irrelevant for such abuse: it does so because it so examines the underlying determination whether the evidence is indeed irrelevant." (*People v. Alvarez* (1996) 14 Cal.4th 155, 201.) Thus, our role is to discern whether the evidence that the defense sought was "relevant to the credibility of a witness" or had "any tendency in reason to prove" a disputed material fact. (Evid. Code, § 210.)

The defense at trial was that Corr was lying about the assault to absolve herself and get back at defendant, her "enemy," and that the identifications of defendant by George and Lopez were unreliable because they had been influenced by rumors

12

circulating in the encampment that identified defendant as Lopez's assailant.  The trial court believed that the relevance of evidence about the rumors lacked foundation because there was no evidence that Lopez had been told of the rumors.  While it is true that evidence that Lopez had heard the rumors had not yet been *introduced at trial* at the time of the trial court's ruling, it was the trial court's ruling—barring the defense from even asking George about the rumors—that precluded such evidence from being introduced.  When George testified *at the preliminary examination*, the defense's cross-examination of him produced precisely the type of foundational evidence that the trial court found lacking at trial and cited as a justification for precluding the defense from asking George at trial about the rumors.

At the preliminary examination, George had testified on cross-examination that ***he*** *had told Lopez about the rumors* that had circulated in the encampment identifying defendant as Lopez's attacker.  "Q. [defendant's trial counsel]:  Did you talk to [Lopez] about what you thought had happened?  [¶]  A.  Yes.  [¶]  Q.  And *you told him what you had heard*?  [¶]  A.  *Yes*.  [¶]  Q.  *And you told him that you had heard that* [*defendant*] *had done that*?  [¶]  A.  *Yes*."  (Italics added.)  On redirect examination at the preliminary examination, the prosecutor eventually got George to backtrack on this assertion, but George's testimony as a whole remained uncertain on this point.  The prosecutor asked:  "But were people in the encampment saying that defendant hit [Lopez] with the bat, or were they just saying [Lopez] got hit with the bat?  [¶]  A.  *Yes*.  [¶]  Q.  Which one?  [¶]  A.  Rick got hit with the bat."  (Italics added.)  In total, George's testimony at the preliminary examination provided a foundation for cross-examining George at trial about whether he had told Lopez that there were rumors that defendant had assaulted Lopez.  Had George denied doing so, the defense could have utilized his testimony at the preliminary examination to attempt to show that he had admitted doing so.

13

Evidence that George had told Lopez about rumors identifying defendant as Lopez's assailant was relevant because it suggested that Lopez's testimony might be based not on his personal knowledge but on his reliance on these rumors. This evidence could have provided some support for the defense at trial, which was that Lopez's statements to the police and his family that the assault was committed by a group of "Mexican[s]" or gang members were true and that his subsequent statements that defendant was his assailant were the product of him being influenced by others.

The Attorney General insists that (1) "there was no evidence of a rumor circulating that *appellant* had been the person who attacked Lopez," (2) "there was no evidence that the rumor had been communicated to Lopez," and (3) "the trial court could properly have limited cross-examination on any relevant rumors because of the risk of undue consumption of time or confusion of the issues."

None of these arguments has any merit. There was "no evidence" because the trial court refused to allow the defense to introduce evidence of the rumors by questioning George about them. Given George's preliminary examination testimony, the defense could readily have introduced such evidence had it been allowed to do so. The Attorney General's claim that the court "could" have excluded this evidence under Evidence Code section 352 is both immaterial and incorrect. No Evidence Code section 352 objection was made or ruled upon, so the trial court did not engage in the weighing that would be required to exclude evidence under that statute. (See *People v. Padilla* (1995) 11 Cal.4th 891, 924, overruled on a different point in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 [record must affirmatively show that trial court engaged in the requisite weighing under Evidence Code section 352].) In any case, the record contains no support for a conclusion that the probative value of evidence about the rumors, which was highly material to the defense challenge to the credibility of Lopez's identification of defendant as his assailant, was "substantially outweighed by the probability" that the rumor evidence would be unduly time consuming or confuse

14

the issues. George's preliminary examination testimony on this point was brief, and the issue—the reliability of Lopez's identification of his assailant—was not confusing but highly probative and readily understandable.

The Attorney General claims that the defense would not have been able to establish that Lopez talked to George *before* Lopez identified defendant as his assailant because Lopez testified that he did not talk to George or anyone else at the encampment on the day that he briefly visited the encampment after leaving the rehabilitation center but before going to his family's home. The record does not establish that the defense could not have made the requisite showing.

Lopez testified that he did not talk to George on the day that he left the rehabilitation center (June 28, 2017), but the Attorney General ignores the prosecutor's investigator's testimony, which indicated that, after staying with his family for about three weeks, Lopez had already left his family's home and resumed living at the encampment *before* Lopez's first identification of defendant as his assailant during the investigator's July 18 interview with Lopez. Thus, the defense might well have been able to provide evidentiary support for an argument that Lopez had spoken to George after June 28 but before the July 18 interview and had therefore been exposed to the rumors before he first identified defendant as his assailant. We conclude that the trial court erred in precluding the defense from eliciting evidence of the rumors from George.

Defendant claims that the trial court's error in excluding this evidence violated his confrontation rights because cross-examination of George about the rumors was also relevant to the credibility of *George's* identification of defendant as the person who he had heard arguing with Lopez at the time of the assault. George had testified at the preliminary examination that he was not positive that the voice he heard was defendant's voice and that he had heard from others in the encampment "what they thought might have happened" before he talked to the police. Whether George had

15

been exposed to rumors identifying defendant as Lopez's assailant before George identified defendant as the man he had heard arguing with Lopez was relevant to the defense theory that those rumors influenced George to mistakenly identify defendant.

The Attorney General contends that defendant forfeited his appellate claim that the exclusion of this evidence violated his confrontation rights because he did not mention it below. A confrontation clause claim may be forfeited if it is not raised in the trial court. (*People v. Tafoya* (2007) 42 Cal.4th 147, 166.) On the other hand, a claim is not forfeited if the claim made below fairly informed the trial court of the required analysis. "If the trial objection fairly informs the [trial] court of the analysis it is asked to undertake, no purpose is served by formalistically requiring the party also to state every possible legal consequence of error merely to preserve a claim on appeal that error in overruling the objection had that legal consequence. Specifically, no purpose would be served by requiring the objecting party to inform the court that it believes error in overruling the actual objection would violate due process." (*People v. Partida* (2005) 37 Cal.4th 428, 437.)

Here, defendant's trial counsel's colloquy with the trial court concerning the rumor evidence did not mention the relevance of the proposed questioning to *George's* identification but only its relevance to Lopez's identification. Since defendant failed to link this evidence to his *right to confront George*, the trial court was not "fairly inform[ed]" of the confrontation issue that defendant now raises on appeal. Had the trial court been faced with a confrontation clause claim, it would have been required to conduct a different and more nuanced analysis than simply whether the evidence was relevant. Because the analysis would have been different, the unasserted confrontation clause claim was forfeited.

Defendant claims that his trial counsel was prejudicially deficient in failing to raise the confrontation clause issue below. As George's exposure to rumors about the identity of Lopez's assailant before he made his identification of defendant as the man

16

he heard arguing with Lopez was clearly relevant to the credibility of his identification, and defendant's trial counsel in fact sought the introduction of this evidence, we agree that his trial counsel was deficient in failing to argue to the trial court that the exclusion of this evidence was a confrontation clause violation.

The next question is whether the trial court's error and defendant's trial counsel's deficiency were prejudicial. Defendant claims that we should evaluate prejudice under *Chapman v. California* (1967) 386 U.S. 18. The *Chapman* standard of review requires "the beneficiary of a constitutional error [the Attorney General] to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Id*. at p. 24.) He asserts that *Chapman* review is merited because the trial court's error violated his confrontation rights under the federal constitution. The Attorney General contends that we should evaluate any prejudice under *People v. Watson* (1956) 46 Cal.2d 818 because defendant did not preserve his confrontation clause contention below. Under *Watson*, reversal is required "only when . . . it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Id*. at p. 836.) " ' " '[A] "probability" in this context does not mean more likely than not, but merely a *reasonable chance,* more than an *abstract possibility*.' [Citation.]" ' [Citation.]" (*People v. Wilkins* (2013) 56 Cal.4th 333, 351 (*Wilkins*).)

Because defendant's confrontation clause claim was forfeited, *Chapman* review is not merited. Therefore, prejudice from the trial court's error is properly reviewed under *Watson*, and prejudice from defendant's trial counsel's deficiency in failing to assert the confrontation clause claim below is evaluated under *Strickland v. Washington* (1984) 466 U.S. 668, 687, 694 (*Strickland*). Under *Strickland*, a defendant must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the

17

outcome." (*Id*. at p. 694.) The defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." (*Id*. at p. 687.)

As defendant claims that the trial court made a second evidentiary error, we will defer our harmless error review under *Watson* and *Strickland* until after we have evaluated whether there was an additional error so that, if there was an additional error, the cumulative prejudice from the errors may be evaluated under the appropriate standards of review.

### 3. *Admission of Lopez's Statement to George*

Defendant contends that the trial court prejudicially erred in permitting George to testify on redirect that, during his conversation with Lopez after Lopez got out of the hospital, Lopez had told George that defendant had hit him with a bat. The Attorney General maintains that defendant's trial counsel failed to preserve this issue for appellate review because she failed to object to the admission of this evidence.

The challenged testimony was immediately followed by the court excusing the jury for the day. After the jury left, the court made the following statement on the record: "Let me just indicate the last piece of testimony of Mr. Ramirez regarding Mr. Lopez's statement that Mr. Ortega hit him with a bat, that statement made to Mr. Ramirez appears to me to be a prior consistent statement under Evidence Code 791. [¶] We have a statement in court of defendant hit him with a bat, an inconsistent statement previously about the alleged gang members, and then *this appears to be a prior consistent statement to that* and therefore is admissible under 791." (Italics added.)

Defendant's trial counsel immediately challenged the court's theory that the testimony was admissible under Evidence Code section 791. "We have no idea when that was in conjunction with—I don't believe it was necessarily before—we don't have a timeline, do we? A reliable timeline." The court defended its reasoning:

18

"I believe it is a—there is a timeline to infer that the statement by Mr. Lopez to Mr. Ramirez *predated* Mr. Ramirez's inconsistent statement to his family members. [¶] I also believe that the statement is admissible under 356 as a—gives context and completion to the partially admitted statement." (Italics added.) (Italics added.)

We do not believe that under these circumstances, defendant's trial counsel's failure to expressly assert an objection to the testimony resulted in forfeiture of the contention. The issue was raised by the trial court immediately after the testimony, and defendant's trial counsel immediately voiced her disagreement with the court's theory of admissibility. As defendant's trial counsel's opposition to the admission of this evidence was expressed in a reasonably timely and specific manner (Evid. Code, § 353, subd. (a)), we decline to find the issue forfeited.

"Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: [¶] (a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and *the statement was made before the alleged inconsistent statement*; or [¶] (b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen." (Evid. Code, § 791, italics added.)

Defendant contends that there was no evidence that Lopez's statement to George was "made *before* the alleged inconsistent statement" made by Lopez to his family. (Evid. Code, § 791, subd. (a), italics added.) The Attorney General argues that because Lopez testified that he went to the encampment before he went to his family's home, the trial court could properly conclude that Lopez's conversation with George preceded Lopez's conversation with his family.

19

No evidence presented at trial supports the Attorney General's timing argument. Lopez testified that he did not talk to anyone when he went to the encampment before going to his family's home, and George never said when his conversation with Lopez occurred except that it was after Lopez got out of the hospital. Since Lopez returned to the encampment *after leaving his family's home*, the only reasonable inference that could be drawn from the evidence was that the conversation between Lopez and George *post*dated Lopez's statement to his family. Consequently, the trial court's theory that Lopez's statement to George was admissible under Evidence Code section 791 was invalid.

The Attorney General alternatively contends that the admission of the statement may be upheld under Evidence Code section 356. That section provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence." (Evid. Code, § 356.) A ruling on the admissibility of evidence under Evidence Code section 356 is reviewed for abuse of discretion. (*People v. Parrish* (2007) 152 Cal.App.4th 263, 274.)

The purpose of Evidence Code section 356 is " ' "prevent[ing] the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed." ' [Citations.] Thus, ' " ' "[i]n the event a statement admitted in evidence constitutes part of a conversation or correspondence, the opponent is entitled to have placed in evidence all that was said or written by or to the declarant in the course of such conversation or correspondence, provided the other statements have *some bearing upon*, *or connection with*, the admission or declaration in evidence." ' " ' " (*People v. Brooks* (2017) 3 Cal.5th 1,

20

49-50.)  " ' "In applying Evidence Code section 356 the courts do not draw narrow lines around the exact subject of inquiry." ' " (*People v. Harris* (2005) 37 Cal.4th 310, 334.)  When evidence is admissible under Evidence Code section 356, a hearsay objection will not prevent its admission.  (*People v. Williams* (1975) 13 Cal.3d 559, 565.)

The trial court did not err in admitting the challenged testimony under Evidence Code section 356.  On cross-examination, defendant's trial counsel elicited George's testimony that he had talked to Lopez after Lopez got out of the hospital and told Lopez what George "thought had happened that night" and that George had heard Lopez and defendant arguing that night.  George testified on redirect that "[i]n that same conversation" Lopez told George that defendant had hit him with a bat.  We find no abuse of discretion in the trial court's finding that Lopez's statement to George and George's statements to Lopez were part of the same conversation about the same subject and were adequately connected to justify admission of Lopez's statement under Evidence Code section 356.

### 4.    *Prejudice*

We return now to the question of prejudice.  As we have already discussed, the trial court erred in excluding evidence of the rumors on relevance and hearsay grounds, and defendant's trial counsel was deficient in failing to argue that the exclusion of this evidence violated defendant's confrontation rights.  We review the prejudice from the error and the deficiency under *Watson* and *Strickland*.  Reversal is required only if defendant can show either a "reasonable chance" or a "reasonable probability" that the result would have been more favorable to him if this evidence had not been excluded.  (*Strickland*, *supra*, 466 U.S. at p. 694; *People v. Wilkins*, *supra*, 56 Cal.4th at p. 351.)

The Attorney General argues that the exclusion of the rumor evidence had no impact on the jury's verdict because "Lopez's and Ramirez's credibility was

21

extensively impeached with evidence of their drug use, inconsistent statements, and prior convictions," thereby rendering the rumor evidence essentially cumulative. While we do not agree that the rumor evidence was cumulative of other evidence, we do conclude that there is neither a reasonable chance nor a reasonable probability that the result would have been different if that evidence had been admitted.

Neither George nor Lopez appeared to have any motive for falsely accusing defendant of assaulting Lopez. Corr had such a motivation, but the rumor evidence had no impact on her testimony. The jury was already aware of Lopez's multiple inconsistent statements about the perpetrators of the assault, and George's testimony established (1) that he had told Lopez what he thought happened, (2) that he had told Lopez that he had overheard an argument between Lopez and defendant, and (3) Lopez had told him that defendant had assaulted him with a bat. Even if the rumor evidence had come in, it would have shown only that Lopez was exposed to the rumors during the same conversation in which both George and Lopez each identified defendant as the perpetrator.

It is quite improbable that, if only evidence had been admitted that George conveyed the rumors to Lopez, a reasonable juror would have concluded that these rumors corrupted Lopez's memory. After all, this was a conversation during which George and Lopez *exchanged information* about the assault. A juror would have had to conclude that George's disclosure to Lopez of the rumors *immediately* caused Lopez to abandon *truthful* prior statements identifying the perpetrators as a group of unknown gang members and instead to *falsely* accuse defendant, his friend.

Reasonable jurors were equally unlikely to find the rumor evidence of value with respect to George's testimony. George testified only that he overheard an argument between Lopez and defendant. The jury was already aware that George had discussed this with his brother Paul, who had told George what he thought happened, before George spoke to the police. It is improbable that evidence that George had

22

heard rumors in addition to what he had heard from Paul would have made any difference in the jury's assessment of the reliability of George's identification of defendant.

We conclude that the trial court's error and defendant's trial counsel's deficiency were not prejudicial and therefore do not merit reversal.

## B.     *Prior Serious Felony Enhancement*

Defendant maintains that he is entitled to a remand for the trial court to exercise its discretion to strike the five-year serious felony conviction enhancement.  The Attorney General argues that a remand is not required.

### 1.     *Background*

Defendant has a very serious criminal history, which began when he was a juvenile, and he has spent much of his adulthood in prison.  He suffered two serious felony convictions in 1999, both for assault with a deadly weapon, was sentenced to 10 years in prison for those convictions, and while in prison was convicted of possession of a weapon, which extended his actual time in prison to 14 years.  He was released from prison in 2012 and at the time of sentencing was a 44-year-old longtime methamphetamine user.

Defendant asked the court to strike one of his two strikes and sentence him to a 14-year prison term rather than the otherwise mandatory three-strikes life sentence. The court denied his request and explained why:  "This case was exceptionally violent, with extensive life-changing injuries, committed by a man who has an extensive history of violence and is a poster child for the three-strikes law.  And I agree wholeheartedly with the district attorney that the solution is incapacitation. [¶]  Whoever reviews this case in the future, this Court's sentencing decision is based on a belief that [defendant] is a continuing danger to our community.  [¶]  I might add also that he took the stand and committed, if it weren't so serious, almost laughable perjury."

23

The court imposed a 25-years-to-life term for the assault consecutive to a three-year term for the GBI enhancement and a five-year term for the serious felony enhancement. Although this was the maximum sentence that the court could impose, the court made no discretionary sentencing decisions other than its denial of defendant's request that it strike one of the strikes.[4]

### 2. *Analysis*

When defendant was sentenced in April 2018, the trial court lacked discretion to strike the serious felony enhancement under section 1385. (*People v. Garcia* (2018) 28 Cal.App.5th 961, 971.) While this appeal was pending, an amendment to section 1385 took effect, which permitted a trial court to exercise its discretion under section 1385 to strike a serious felony enhancement. (*Garcia*, *supra*, at p. 971.) This amendment applies retroactively to all cases that were not final when it took effect. (*Id*. at pp. 972-973.) Defendant's case was not final when the amendment took effect, and the Attorney General concedes that this amendment applies retroactively to defendant's case.

The Attorney General nevertheless insists that a remand is "unnecessary" because "[t]he trial court's statements and sentencing decisions clearly indicate that it would not strike the prior serious felony enhancement if it had the discretion."

" 'A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' [Citation.] In such circumstances, . . . the appropriate remedy is to remand for resentencing *unless the record 'clearly indicate[s]' that the trial court would have*

---

[4] Because use of a deadly weapon was an element of the offense, the court, as mandated by section 12022, subdivision (b)(1), did not impose the term for the personal use of a deadly or dangerous weapon enhancement. This was not a discretionary choice.

24

*reached the same conclusion 'even if it had been aware that it had such discretion.'* [Citations.]" (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391, italics added.)

The record in this case does not " 'clearly indicate[]' " that the trial court would not have exercised its discretion if it had been aware that it had discretion to strike the serious felony enhancement. The Attorney General relies on the trial court's statements concerning defendant's request that the court strike one of the strikes, but these statements were limited to the reasons why defendant fell within the Three Strikes scheme. Section 1385 permits a court to broadly consider any relevant factors "in furtherance of justice" in exercising its discretion to strike a serious felony enhancement. As defendant points out, the trial court's exercise of this discretion would involve a choice between defendant being eligible for parole when he is in his late 60s or defendant being eligible for parole in his early 70s. The fact that defendant had committed a very serious offense, had a very serious criminal record, and was a danger to the community who required incapacitation at age 44 did not necessarily indicate that the court would conclude that making defendant eligible for parole at age 67 rather than at age 72 was not in the interests of justice. The trial court's comments were not necessarily inconsistent with a conclusion that a sentence of 28 years to life rather than 33 years to life was sufficient incapacitation of defendant to protect the community, given that he would be a senior citizen before he would be eligible for parole in either case. We therefore conclude that a remand is required, though we express no opinion on how the trial court should exercise its discretion.

## IV. DISPOSITION

The judgment is reversed, and the matter is remanded for the sole purpose of permitting the trial court the opportunity to exercise its discretion to strike the serious felony enhancement. If the court strikes the enhancement, it shall resentence defendant. If it declines to strike the enhancement, it shall reinstate the judgment.

_____

ELIA, J.

WE CONCUR:


_____

PREMO, Acting P.J.



_____

GROVER, J.




*People v. Ortega*
H045850